FOWLER HOSIERY COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 78850.    Filed April 28, 1961.

*Leo J. Schwartz, Esq.*, and *Arthur S. Freeman, Esq.*, for the petitioner.

*Delman H. Eure, Esq.*, for the respondent.

SCOTT, *Judge:* Respondent determined a deficiency of $205,850.70 in income tax of the petitioner for the calendar year 1955. The issues for decision are whether the amount of $1,500,000 received by petitioner from its wholly owned Canadian subsidiary was an ordinary dividend as petitioner contends or a distribution in partial liquidation as determined by respondent; if the amount was a liquidating distribution, whether petitioner in accordance with its alternative contention is entitled to a credit for foreign taxes deemed to have been paid; and whether the value of certain machines received

by petitioner represents capital gain as reported by it or ordinary income as determined by respondent.

FINDINGS OF FACT.

Petitioner is a Wisconsin corporation, incorporated in 1904. Its principal office is presently located at 835 Merchandise Mart, Chicago, Illinois. Its income tax return for the calendar year 1955 was filed with the district director of internal revenue at Milwaukee, Wisconsin, on July 12, 1956.

On September 9, 1955, petitioner changed its name from Holeproof Hosiery Company to Fowler Hosiery Company, Inc. Before 1955 petitioner's principal office was located at 404 West Fowler Street, Milwaukee, Wisconsin. Until July 1955 petitioner was engaged in the manufacture and sale of hosiery, socks, sleepwear, underwear, and lingerie.

Petitioner's authorized capital stock consisted of 1 million shares of common stock, $5 par value. As of June 30, 1955, it had issued and outstanding 537,420 shares, 336,027 (approximately 62½ percent) of which were held by six voting trustees for the beneficiaries of a voting trust, and the remaining 201,393 were held by approximately 700 other individuals. The voting trust was established in 1950.

During 1955 petitioner had six wholly owned United States subsidiaries and one wholly owned Canadian subsidiary, Fowler Hosiery Company (Canada), Ltd., hereinafter referred to as Fowler of Canada. The six United States subsidiaries were: Athco, Inc.; Winston Mfg. Co., Inc.; Quitman Manufacturing Company; Quitman Knitting Company; Cooper, Wells & Co.; and 301 N. Water Building Corp.

Fowler of Canada was incorporated under the Dominion Companies Act of Canada (1952 Rev. Stats. Canada, ch. 53) by letters patent dated April 11, 1911, under the name of Holeproof Hosiery Company of Canada, Ltd. On September 9, 1955, it changed its corporate name to Fowler Hosiery Company (Canada), Ltd. In 1946 and for many years prior thereto Fowler of Canada's authorized and issued capital stock consisted of 3,500 shares with a par value of $100 per share. As of January 1946 petitioner owned 1,750 shares of the stock of Fowler of Canada which it had acquired at various times at a cost of $78,814.75. During 1946 petitioner acquired the remaining 1,750 shares of stock of Fowler of Canada at a cost of $303,225, giving petitioner a total cost basis for the 3,500 shares of stock of Fowler of Canada of $382,039.75. Petitioner owned all of the issued and outstanding shares of stock of Fowler of Canada from the date of acquisition in 1946 of the 1,750 shares until June 17, 1960. During 1955 and prior thereto, Fowler of Canada

was engaged in the manufacture of hosiery, lingerie, and cloth, with its principal office located in London, Ontario, Canada.

Gustave Frankel is now president of petitioner and has been president since 1945 and a member of its board of directors since 1944. He was one of the six voting trustees of the voting trust of petitioner's stock. Including Gustave Frankel, five of the nine members of petitioner's board of directors were voting trustees and three others were beneficiaries of the voting trust. Gustave Frankel and the immediate members of his family owned about 10 or 11 percent of petitioner's stock and his brother, Louis Frankel, and the immediate members of his family owned approximately the same amount of petitioner's stock.

During 1955 the board of directors of Fowler of Canada were: L. W. Turner, Gustave Frankel, Gerald Frankel, Burt Myron, and J. C. Lacey. Its officers were L. W. Turner, president, and J. C. Lacey and Burt Myron, vice presidents. These officers were employees of the corporation, regularly engaged in its operation. In 1956 L. T. Schroeder was assistant secretary and treasurer of Fowler of Canada, and in 1957 he was treasurer of Fowler of Canada. L. T. Schroeder was also an officer of petitioner.

In the early part of 1955 petitioner began negotiating with Julius Kayser & Co. (hereinafter referred to as Kayser), a New York corporation, for the sale by petitioner to Kayser of its entire business as a going concern. Petitioner was willing to sell to Kayser its fixed assets at book value in installments payable over a 5-year period, provided it received cash for the remaining operating assets. Kayser could not purchase the fixed assets on this basis because of restrictions on the indebtedness it could incur. There was worked out between petitioner's stockholders who were the voting trustees under the voting trust agreement of 1950 and Kayser (subject to the approval of petitioner's board of directors and stockholders which these voting trustees would undertake to procure) an agreement which was incorporated into a formal written agreement dated July 1, 1955, whereby petitioners and its six wholly owned United States subsidiaries would sell to Kayser all of their inventories, supplies, prepaid expenses, accounts receivable, patents, trademarks, licenses, and goodwill, including the corporate name "Holeproof." Pursuant to this same agreement Fowler of Canada would sell its inventory, prepaid expenses, accounts receivable, and goodwill to Julius Kayser & Co., Ltd., of Canada (hereinafter referred to as Kayser of Canada), a wholly owned subsidiary of Kayser. Simultaneously with these sales and pursuant to the same agreement, petitioner and its United States subsidiaries would lease to Kayser, and Fowler of Canada would lease to Kayser of Canada all of their fixed assets, consisting of land, buildings, machinery, and equipment for a 5-year period commencing July 1, 1955, and

ending June 30, 1960. Forms of the contract and leases were attached to the July 1, 1955, agreement and the leases, with the exception of the amounts of rent to be paid, were identical. The agreement provided that upon the expiration of such leases, the lessees would purchase the leased properties at their then book value, provided they had been depreciated on petitioner's books of account at rates previously and customarily used, Kayser having the option to accelerate the purchase of the assets at their book value on the date of exercise of that option.

The proposed contract provided that the sale of the current operating assets was to be effective and the prices determined as of the close of business on June 30, 1955, with the purchase prices to be paid at the date of closing. Petitioner and Fowler of Canada were to continue the normal and customary operation of the business for the account of Kayser and Kayser of Canada until the closing date under the agreement. All sales made after June 30, 1955, were to be for the benefit of Kayser, and all liabilities incurred, chargeable to Kayser. Similar adjustments were provided with respect to vacation pay, pensions, bonuses, rent, and other items. Kayser was to collect for petitioner all accounts receivable outstanding on June 30, 1955.

Petitioner agreed to change its name and that of its subsidiaries to exclude the use of the word "Holeproof."

Petitioner agreed to supply Kayser a complete list of its customers for the purpose of permitting Kayser to solicit them as its customers and to transfer to Kayser all of its unfilled orders for sales of its manufactured products. Kayser was to assume all service contracts, union agreements, pension plans, and other executory contracts of petitioner and Fowler of Canada. Petitioner would agree that on and after the closing date and during the term of the leases neither it nor its subsidiaries would manufacture or sell any product then being manufactured or sold by them. Petitioner was to use its best efforts to make and keep available to Kayser the services of all employees in any way connected with the production and sales of its products and to furnish Kayser with information concerning its history, methods of operation, sales and cost policies, and other data necessary to enable Kayser to continue the regular operation of the business. The yearly rental under the leases of the fixed assets which included both real and personal property was to be a sum equal to the amount of annual depreciation currently being charged on the property adjusted to reflect any gain or loss due to disposition of any asset during the year.

On August 15, 1955, petitioner's board of directors issued a Notice of Special Meeting of Shareholders to be held in Milwaukee, Wisconsin, on September 6, 1955. The purpose of this meeting was stated to be to consider and act upon the proposed contract with Kayser and the advisability of dissolving the corporation. The notice explained that

the voting trustees had entered into the July 1, 1955, agreement with Kayser concerning the proposed contract and outlined the terms and provisions of the agreement. It stated that petitioner's board of directors, at a special meeting held on July 26, 1955, had approved and recommended execution of the contract. A statement was attached to this notice of stockholders meeting intended to demonstrate the general effect of the proposed transactions between petitioner and Kayser. The statement contained preliminary estimates made by the management of the net amounts to be realized by petitioner and times of their receipt and distribution to petitioner's stockholders. The statement was for Holeproof and subsidiary companies and a footnote explained that for convenience the company and all of its wholly owned subsidiaries had been treated as one entity. The estimated net receipts between date of closing (approximately September 9, 1955) and January 15, 1956, were shown as follows:

| | |
|---|---:|
| Retained cash | $2, 440, 000 |
| Sales of inventories [1] | 7, 260, 000 |
| Collection of accounts receivable—90% thereof | 1, 750, 000 |
| Sales of prepaid items [1] | 307, 000 |
| Sale of Quitman mortgage [1] | 112, 000 |
| Rental received for plants [2] | 315, 000 |
| | 12, 184, 000 |

[1] To Julius Kayser & Co. under contract.
[2] Under lease to Julius Kayser & Co. and its Canadian subsidiary.

From these receipts was deducted payment of all liabilities outstanding at June 30, 1955, estimated at $3,500,000, and estimated expenses of sale and liquidation, and reserve for taxes (Canadian subsidiary), and contingencies of $170,000, leaving a balance of $8,514,000. An estimated initial distribution to shareholders on or about January 15, 1956, of $15 per share, totaling $8,061,300, was shown with a remainder of $452,700. The estimate showed, for the years 1956, 1957, 1958, 1959, and 1960, remaining balances and amounts to be received from rentals for plants (with an item of collection of remainder of accounts receivable in 1956). It showed estimated distribution to shareholders of $2 per share on or about January 15, 1957, $1 per share on or about January 15, 1958, 1959, and 1960, and a projected final distribution on or about August 31, 1960, estimated at $4 per share. The final distribution was estimated after an allowance for contingencies, additional expenses, adjustments, etc. In the year 1960, in addition to rentals received from plants, there was included realization from investment in 301 North Water Building Co. and in McComb Manufacturing Co., and receipts from sales of plants and equipment to Kayser.

At the special meeting of the stockholders held on September 6, 1955, pursuant to the notice issued on August 15, 1955, petitioner's

stockholders adopted resolutions authorizing the execution of the proposed contract and leases with Kayser and Kayser of Canada. After an explanation of the information contained in the notice of meeting of petitioner's stockholders concerning the proposed liquidation and dissolution, petitioner's stockholders adopted a resolution to dissolve the corporation and authorized its board of directors:

to proceed with the collection of all of the assets of this corporation and the payment and discharge of all of its liabilities and obligations and to do all other acts required to liquidate its business and affairs, and, after paying or adequately providing for the payment of all of its obligations including those contingent in nature, to distribute the remainder of its assets in cash among the shareholders * * *

Petitioner's stockholders, at this meeting, also resolved that the corporation's name should be changed from Holeproof Hosiery Co. to Fowler Hosiery Company, Inc.

A special meeting of the stockholders of Fowler of Canada was held in London, Ontario, on September 6, 1955, at which the proposed contract and lease between Fowler of Canada and Kayser of Canada was presented for consideration. There were also presented copies of the resolutions adopted on July 26, 1955, at the special meeting of petitioner's board of directors and on September 6, 1955, at the special meeting of petitioner's stockholders, both approving the proposed contract and leases and plan of liquidation. At the meeting on September 6, 1955, the stockholders of Fowler of Canada adopted resolutions approving and ratifying the agreement of July 1, 1955, insofar as it applied to the Canadian corporation and authorizing the sale of its assets to Kayser of Canada. At this meeting the stockholders also adopted a resolution changing the name of the corporation to Fowler Hosiery Company (Canada), Ltd. On the same day, September 6, 1955, at a separate meeting the board of directors of Fowler of Canada were presented the resolution adopted by the stockholders thereof and the stockholders and board of directors of petitioner and copies of the proposed contract of sale and lease between Fowler of Canada and Kayser of Canada. Turner, Lacey, and Myron attended the meeting and the other directors waived notice and consented to the business to be transacted. Resolutions were adopted at this meeting of the board of directors of Fowler of Canada approving and ratifying the proposed agreement of July 1, 1955, insofar as it pertained to the Canadian corporation, and authorizing the officers of the Canadian corporation to sell its assets to Kayser of Canada and execute the proposed lease and change the name of the corporation to Fowler Hosiery Company (Canada), Ltd.

The closing, pursuant to petitioner's agreement with Kayser dated July 1, 1955, was held on September 9, 1955. On that date the contract of sale and leases between petitioner and Kayser were executed.

Kayser paid petitioner $8,092,416.18, consisting of $7,975,416.18 for the purchase of the current assets of petitioner and its domestic subsidiaries and $117,000 rent for the months of July, August, and September. At the September 9, 1955, closing, Kayser of Canada was obligated to pay Fowler of Canada $1,818,180.83 in Canadian funds, consisting of $1,777,680.83 for the purchase of current assets and $40,500 rent for the months of July, August, and September. This obligation was satisfied on that date by payments totaling $1,842,044.45 in United States funds. At the time the agreement with Kayser was closed, Fowler of Canada had a net worth of approximately $2,600,000. Prior to the agreement with Kayser, Fowler of Canada had approximately 700 employees. After the closing under the agreement, most of these employees worked for Kayser of Canada, and Fowler of Canada had no employees other than a bookkeeper and secretary.

Leo J. Schwartz is an attorney specializing in Federal tax law. Prior to July 1, 1955, he was consulted by petitioner in connection with the negotiations then in progress for the sale of petitioner's assets to Kayser. At about the time the agreement of July 1, 1955, was drafted, petitioner was considering, among other alternatives, liquidating and distributing the cash proceeds it would receive from the sale of its assets and the assets of its domestic subsidiaries, together with a distribution to its stockholders of the stock of Fowler of Canada as an initial liquidating distribution. Schwartz was requested to obtain a ruling from the Internal Revenue Service regarding the tax consequences of such a distribution. After informal consultation with representatives of the Internal Revenue Service, Schwartz advised petitioner that it was likely that the Internal Revenue Service would rule favorably to the taxpayer's position that a cash distribution not in excess of the amount received from Kayser would constitute a distribution in partial liquidation under section 346 of the Internal Revenue Code of 1954, but that a distribution of the stock of Fowler of Canada would not be so considered. After Schwartz reported the result of this informal discussion with representatives of the Internal Revenue Service to petitioner, it was decided that the stock of Fowler of Canada would not then be distributed and that the request to the Internal Revenue Service for a ruling would be limited to a request involving only petitioner's distribution of cash proceeds. On December 9, 1955, petitioner submitted a written request for a ruling that the proposed distribution by petitioner to its stockholders of $8,061,300, representing $15 per share, on or about January 15, 1956, qualify as a partial liquidation under section 346 of the Internal Revenue Code of 1954. This written request for a ruling outlined the history of petitioner and the substance of the agreements between petitioner and Kayser and stated in part:

As a result of the aforesaid sales, Holeproof and its subsidiaries, including its Canadian subsidiary, have ceased the active operation of their former businesses. After such sales, the assets of Holeproof consisted of cash, certain

investments with an aggregate book value of $392,412.37, and the fixed assets leased to Kayser; and the assets of Holeproof Hosiery Company of Canada, Limited, consisted of cash and the fixed assets leased to Kayser's Canadian subsidiary. Until July 1, 1960, the activity of Holeproof and its Canadian subsidiary will be limited to the collection of rent for the fixed assets leased to Kayser and its Canadian subsidiary. On July 1, 1960 such leased assets will be sold and both Holeproof and its Canadian subsidiary will then complete their program of dissolution.

To carry out the plan of liquidation and dissolution adopted by the shareholders at their meeting of September 6, 1955, Holeproof proposed to distribute to its shareholders a liquidating dividend of $15.00 per share on or about January 15, 1956. Holeproof has issued and outstanding a total of 537,420 shares, so that such distribution will amount to $8,061,300.00. Such amount is less than the amounts received by Holeproof and its Canadian subsidiary in 1955 for the sale of its assets.

In each of the years 1956, 1957, 1958, 1959 and 1960, Holeproof and its Canadian subsidiary will receive rental payments, and such payments may be distributed yearly to its shareholders. On July 1, 1960, Holeproof and its Canadian subsidiary will sell its fixed assets and will then distribute its remaining cash to its shareholders in final distribution. It is presently estimated that the distributions to be made to the shareholders of Holeproof will aggregate $24.00 per share.

A special meeting of the board of directors of petitioner was held on December 20, 1955, to consider, among other matters, the declaration of an initial liquidating dividend. There was called to the attention of the board of directors a copy of the preliminary estimates of the amounts which might be realized upon the distribution of petitioner's assets, the estimated times of receipt thereof, and the estimated time of distribution to the shareholders. The board of directors was informed that the accountants had not completed work on the post closing audit, but that it appeared from the cash and cash equivalent assets on hand and the estimated liabilities that an initial liquidating dividend of $15 per share could be made to the shareholders in accordance with the preliminary estimates previously made. A resolution was then passed that an initial liquidating dividend of $15 per share be paid in cash on January 16, 1956, on the outstanding shares of petitioner's common stock. Pursuant to this resolution petitioner paid to its shareholders the sum of $7,904,235 on January 19, 1956, as the initial liquidating distribution.

At the meeting of December 20, 1955, petitioner's board of directors also adopted resolutions authorizing the liquidation and dissolution of petitioner's six wholly owned United States subsidiary corporations. On December 20, 1955, each of petitioner's six wholly owned United States subsidiary corporations held a joint meeting of its shareholders and directors at which each corporation adopted a substantially iden-

tical resolution of complete liquidation. Thereafter, each of these subsidiary corporations was liquidated and their assets, after payment of debts, obligations, and liabilities, were distributed to petitioner.

The board of directors of Fowler of Canada, at a meeting held on December 20, 1955, took the following action:

The Chairman requested the meeting to give consideration to the question of declaring a dividend to its shareholders of record as of the 27th day of December, 1955. Upon motion duly proposed and seconded it was resolved that a dividend be and the same is hereby declared in the amount of $1,500,000 payable in cash on the 27th day of December, 1955 to the shareholders of record of the Company as of that date.

At this meeting the board of directors adopted a resolution that the First National Bank of Chicago be designated a depositary in which the funds of the company might be deposited by its officers, agents, or employees.

The First National Bank of Chicago was the main bank of petitioner although petitioner did business with several other banks. It was not the main bank of Fowler of Canada, but the main banking business of that company was done in Canada at the Bank of Montreal.

On December 27, 1955, Fowler of Canada paid to petitioner, its sole stockholder, the amount of $1,500,000 pursuant to the resolution adopted on December 20, 1955. Prior to the payment of $1,500,000, Fowler of Canada had accumulated earnings and profits of approximately $2,200,000. As of December 31, 1955, after the $1,500,000 payment, Fowler of Canada's books showed assets of $1,174,661.24, liabilities of $124,330.28, and accumulated earnings and profits of approximately $700,000. As of December 31, 1955, the assets of Fowler of Canada consisted of approximately $156,000 in cash or its equivalent and approximately $1,018,000 in fixed assets, which fixed assets were leased to Kayser of Canada. The Dominion of Canada withheld an income tax of $75,000 from the payment of $1,500,000 by Fowler of Canada to petitioner.

On January 13, 1956, petitioner informally received information that the ruling it had requested by letter dated December 9, 1955, might not be issued since under the existing circumstances it was possible that petitioner could repossess the leased assets and resume its former business. Because of this information Gustave Frankel postponed the distribution scheduled for January 16, 1956.

On January 17, 1956, Leo Schwartz prepared a supplement to the original request for ruling in which it was stated that petitioner was willing to enter into an agreement to the effect that a complete liquidation would occur upon any termination of the leases or the sale of the property.

**210**

This statement was ratified by the petitioner at a meeting of the board of directors held on January 19, 1956. The supplement to the request for ruling also stated, in part, as follows:

Holeproof Hosiery Company of Canada, Limited, has not adopted a resolution of dissolution and it is contemplated that it will not dissolve until it sells its leased assets. In December 1955, it paid a dividend of $1,500,000 to its parent.

\*    \*    \*    \*    \*    \*    \*

As a result of the transaction with Kayser, Holeproof and its subsidiaries have ceased the active operation of their former businesses and the activity of Holeproof and its Canadian subsidiary are limited solely to the collection of the sums due from Kayser. Holeproof has disbanded its entire organization—it has given up its production, design, selling, shipping and supervising departments and now has only some three or four employees. While it is a fact that legal title to the fixed assets remain in Holeproof and its Canadian subsidiary, they cannot use these assets to operate their former business unless Kayser defaults. There is no reason to believe or expect that Kayser will default. Kayser is paying the rental currently and each payment makes the possibility of default more remote. Moreover, even if a default occurs, Holeproof is not obliged to terminate the leases and retake possession of the leased assets. In such event, under Section 3.9 of the agreement, Holeproof has the option to terminate the leases and require Kayser to purchase the property at its then book value. Finally, even if Holeproof retakes possession of the leased property, it would not be in position to re-engage in its former business since its organization has been scattered to the winds and its principal trade marks, "Holeproof" and "Luxite," will have lost their value. In any event, Holeproof will never re-engage in its former business. If it should reacquire possession of the leased property, it intends to and agrees to sell and liquidate said property as expeditiously as possible in carrying out the program of dissolution adopted by its shareholders at the meeting of September 6, 1955.

On February 21, 1956, the Commissioner of Internal Revenue issued a ruling to petitioner that the initial distribution to its stockholders would constitute a distribution in partial liquidation under section 346(a) of the Internal Revenue Code of 1954.

Fowler of Canada filed a corporation income tax return with the Dominion of Canada for its calendar year 1955. It was signed by L. T. Schroeder as assistant treasurer and assistant secretary of the corporation under date of June 28, 1956. Attached to this return was a balance sheet, as of December 31, 1955, headed as follows:

FOWLER HOSIERY COMPANY OF CANADA, LTD.
(*In Process of Liquidation and Dissolution*)

After listing assets and liabilities, the following appears as an adjustment under the heading, "Liabilities, Stock and Earned Surplus": "Less—Liquidating dividend paid $1,500,000.00." The statement of profit and loss attached to the 1955 Canadian income tax return of

Fowler of Canada had a heading identical to that appearing on the balance sheet as of December 31, 1955. Five other schedules attached to the return were headed, "FOWLER HOSIERY COMPANY OF CANADA LIMITED."

Fowler of Canada filed an amended corporation income tax return with the Province of Quebec, Canada, for its calendar year 1955. This return was signed by L. Schroeder as assistant secretary and treasurer under date of June 28, 1956. It contained a balance sheet, profit and loss statement, and five other schedules headed identically to those attached to the 1955 Dominion of Canada corporation income tax return of Fowler of Canada.

Fowler of Canada filed a Security Transfer Tax Act return with the Province of Ontario, Canada, for 1955. It was signed by L. Schroeder as assistant secretary and treasurer under date of June 11, 1956, gave the address of the corporation as 404 West Fowler Street, Milwaukee, Wisconsin, and contained among others the following questions and answers:

    4. Address of chief office in Ontario—None
    5. Nature of business—In process of liquidation

The 1956 corporation income tax return filed by Fowler of Canada with the Dominion of Canada was signed by L. T. Schroeder as treasurer of the corporation under date of June 18, 1957. It contained two typed and one handwritten balance sheets. One unsigned, typed copy shows a "Reserve for contingencies" of $22,857.72. The other two show this amount as a "Reserve for liquidation." The typed schedule showing a "Reserve for liquidation" was signed by L. Schroeder as treasurer of the corporation and captioned:

FOWLER HOSIERY COMPANY OF CANADA, LIMITED
(*In Process of Liquidation and Dissolution*)

The 1956 Dominion of Canada tax return also contained two typed and one handwritten operating statements. One of the typed copies was signed by L. Schroeder as treasurer. The other two were not signed. The signed operating statement is captioned:

FOWLER HOSIERY COMPANY OF CANADA, LIMITED
(*In Process of Liquidation and Dissolution*)

The caption on all schedules or statements attached to the 1956 Dominion of Canada income tax return, other than as is set forth above, is "FOWLER HOSIERY COMPANY OF CANADA, LIMITED."

The petitioner mailed annual reports to its stockholders for each of the years 1955 through 1959. These reports contained a president's

letter, a consolidated statement of assets and liabilities of petitioner and its subsidiaries, a consolidated statement of the equity of petitioner's stockholders, and an opinion letter from petitioner's auditors, Arthur Andersen & Co.

The president's letter in petitioner's 1955 stockholders' report stated, in part:

I am pleased to submit herewith the Annual Report of Fowler Hosiery Company, Inc. for the year 1955, including the Consolidated Statement of Assets and Liabilities of Fowler Hosiery Company, Inc. and Canadian subsidiary (in process of liquidation and dissolution) as at December 31, 1955 * * *.

* * * * * * *

The liquidation of the Company and its Canadian subsidiary is continuing. All of the Company's other subsidiaries have hitherto been dissolved.

This letter was signed by Gustave Frankel, president, and dated August 22, 1956.

The consolidated statements of assets and liabilities and equity of stockholders contained in the petitioner's 1955 report were captioned:

FOWLER HOSIERY COMPANY, INC. AND CANADIAN SUBSIDIARY
(*In Process of Liquidation and Dissolution*)

The consolidated statement of assets and liabilities included the following note:

On September 6, 1955, the stockholders of Fowler Hosiery Company, Inc. (Formerly Holeproof Hosiery Co.) approved the dissolution and liquidation of the company and its subsidiaries and the distribution of assets to the stockholders over a period ending in 1960. At December 31, 1955, all of the subsidiary companies except the Canadian subsidiary had been liquidated.

The opinion letter of petitioner's auditors dated July 1, 1956, and contained in the 1955 stockholders' report included the following statement:

We have examined the consolidated statement of assets and liabilities of FOWLER HOSIERY COMPANY, INC. (a Wisconsin corporation) and Canadian subsidiary (in process of liquidation and dissolution) as of December 31, 1955, * * *

The president's letter in the 1956 stockholders' report, dated March 6, 1957, referred to the Consolidated Statement of Assets and Liabilities of Fowler Hosiery, Inc., and Canadian subsidiary (in process of liquidation and dissolution) on December 31, 1956, and stated that:

An initial liquidating distribution of $15.00 per share was paid to the Stockholders in January, 1956 and a second liquidating distribution of $2.00 per share was made in January, 1957. The liquidation of the Company and its Canadian subsidiary is continuing.

The consolidated statements of assets and liabilities and equity of stockholders in petitioner's 1956 report were captioned:

FOWLER HOSIERY COMPANY, INC. AND CANADIAN SUBSIDIARY
*(In Process of Liquidation and Dissolution)*

The statement of assets and liabilities contained the same note as that appearing in such statement in the 1955 report. The auditor's letter also referred to "Fowler Hosiery Company, Inc. (A Wisconsin corporation) and Canadian subsidiary (in process of liquidation and dissolution)."

The president's letter in petitioner's 1957 stockholders' report, dated March 6, 1958, contains the statement:

> The Internal Revenue Service is alleging a deficiency of $205,850.70 in Federal income taxes for the calendar year 1955. The major issue involved concerns the applicable method of taxing dividends received from our Canadian subsidiary. This deficiency is being protested.

References to this determination by the Internal Revenue Service and to the present case are also contained in the president's letters for 1958 and 1959.

In the 1957, 1958, and 1959 reports, the consolidated statements of assets and liabilities and equity of stockholders is captioned:

FOWLER HOSIERY COMPANY, INC.
*(In Process of Liquidation and Dissolution)*
AND CANADIAN SUBSIDIARY

Petitioner declared and paid to its stockholders, in addition to the $15 liquidating distribution heretofore set forth, $2 per share in January 1957 and $1 per share in January 1958, 1959, and 1960, respectively.

As of December 31, 1955 and 1956, petitioner had outstanding 526,949 shares of common stock. As of December 31, 1957, 1958, 1959, and 1960, petitioner had outstanding 526,899 shares of common stock.

In January 1960 the stockholders and board of directors of Fowler of Canada adopted resolutions to change the corporation's capitalization from 3,500 shares of $1-par-value common stock to 526,899 shares without nominal or par value. These resolutions were made subject to confirmation by the Secretary of State of Canada, and on March 22, 1960, supplementary letters patent were issued confirming the change.

On May 24, 1960, petitioner's board of directors adopted the following resolution:

> RESOLVED that a sixth liquidating distribution be and the same is hereby declared on the outstanding shares of common stock, $5 par value of this Company, payable in stock of Fowler Hosiery Company (Canada) Limited, at the rate of one share of stock of Fowler Hosiery Company (Canada) Limited for each share of stock of this Company. Such distribution shall be paid to stock-

holders of record at the close of business on May 25, 1960 and the delivery of such stock shall be made on June 17.

The distribution was made on June 17, 1960.

On July 14, 1960, petitioner and Fowler of Canada sold to Kayser and Kayser of Canada, respectively, the assets theretofore leased to Kayser and Kayser of Canada as provided in the July 1, 1955, contract of sale.

In its Federal income tax return for 1955, petitioner reported the $1,500,000 distribution received from Fowler of Canada as an ordinary dividend subject to tax at the 52 percent rate. The tax attributable thereto was $780,000 and the return claimed a foreign tax credit of $744,727.29, consisting of $75,000 for taxes actually paid claimed under section 901 of the Internal Revenue Code of 1954 and $669,727.29 for taxes deemed to have been paid claimed under section 902 of the Internal Revenue Code of 1954.

Respondent, in the statutory notice of deficiency, determined that the $1,500,000 distribution was received by petitioner in partial liquidation of Fowler of Canada and that it resulted in a long-term capital gain of $1,117,960.25. A foreign tax credit of $75,000 under section 901 of the Internal Revenue Code of 1954 was allowed, and no credit was allowed under section 902.

Fowler of Canada, at the date of the trial of this case in September 1960, had a net worth of about $1,050,000 consisting of cash and Government bonds.

Fowler of Canada did not adopt any resolution for its dissolution prior to its payment of the cash distribution of $1,500,000 to petitioner on December 27, 1955, had not at the date of the trial of this case adopted any resolution for its dissolution, and was at that time in good standing as a Canadian corporation. As of the end of September 1960, the stockholders of Fowler of Canada had made no final decision as to the future of the corporation. Consideration was being given to converting the corporation into a holding company as well as to finding an active business for it to engage in or dissolving it.

Frank Coile invented a new type of seamless hosiery machine known as the Coile machine and filed an application for letters patent based on his invention. Coile, under the name of the Keller Machine Company, a sole proprietorship, was engaged in the manufacture of parts, accessories, and appliances for knitting machinery and equipment and proposed to manufacture and sell Coile machines.

On December 10, 1953, petitioner entered into a contract with Coile for the purchase of Coile machines and the issuance of a license for the exclusive operation and use of the machine whereby Coile agreed to sell to petitioner 60 Coile machines for $3,000 each with deliveries scheduled in 1954, the final delivery to be made not later than July 15, 1954, and gave petitioner an option to purchase additional Coile ma-

chines during a period ending 9 months after the completion of delivery of the initial 60 machines. In addition Coile gave petitioner the sole, exclusive, and irrevocable license for the use and operation of the Coile machines for a period of 9 months following the date of the final delivery of the machines purchased by petitioner pursuant to the agreement. Petitioner agreed to pay Coile the sum of $30,000 concurrently with the execution and delivery of the agreement and an additional $30,000 on February 1, 1954, as a portion of the royalties due for the exclusive license commencing with the date of the agreement and extending to the expiration of 9 months from the completion of delivery of the initial 60 machines and any additional machines which petitioner might elect to purchase. As additional royalties for the exclusive license, petitioner agreed to pay Coile the additional sum of $60,000 which would be due and payable to Coile at the expiration of 9 months from the date of the completion of delivery of the initial 60 Coile machines, it being provided, however, that this payment should be reduced if additional machines were ordered. Petitioner was given the option of extending its exclusive license for a period of 9 years from the date of exercise of the option to do so, which was required to be exercised within the 9-month period for which the original exclusive license was granted. In the event petitioner exercised this option royalties under the extended license were to be $35,000 per year, and Coile agreed to disclose all additional inventions or improvements relating to the basic Coile machine and obtain any patents desired by petitioner on additional inventions.

Upon the expiration of the license, if extended, Coile agreed that for the remaining life of any patents covering additional inventions or improvements relating to the machine, petitioner was to have, without payment of further royalties, the sole, exclusive, and irrevocable right to purchase and license for the use and operation of the machine, including all related inventions and improvements. If petitioner did not elect to extend the license for the 9-year period, it, nevertheless, was to have the right at all times to unrestricted use, operation, and enjoyment of all machines purchased from Coile, without obligation to pay additional royalties. In such event, Coile could grant nonexclusive licenses to other persons.

Petitioner made the two payments totaling $60,000 as called for by the December 10, 1953, agreement and paid Coile $3,000 for each machine delivered to it by Coile in 1954, but Coile delivered only 18 of the 60 machines required to be delivered in 1954.

In December 1954, Coile desired to sell the assets of the Keller Machine Company including his entire right, title, and interest in the Coile machine and patents thereon to Textile Machine Works, a Pennsylvania corporation. However, Coile could not convey his in-

terest in the machine, inventions, and patents free of claims because petitioner had an exclusive and irrevocable license.

On December 31, 1954, petitioner and Coile executed a second agreement which, after reciting the general terms of their 1953 contract, provided in part:

Coile has up to this date delivered to Holeproof [petitioner] a total of only eighteen (18) Coile Machines and therefore is now and has for some time been in default by reason of his failure to keep and perform the terms, covenants and conditions on his part to be kept and performed, and Coile acknowledges and understands that Holeproof [petitioner] has been substantially damaged because of his failure to keep and perform said Agreement of December 10, 1953, and that it would be difficult to fix, assess and ascertain the damages which have been sustained by Holeproof [petitioner] by virture of Coile's defaults; * * *

* * * * * * *

* * * in order that Coile may be able to transfer to Textile his entire right, title and interest in said inventions and patents, free of any claims, licenses or other interests in favor of third persons in general and of Holeproof [petitioner] in particular, he has requested Holeproof to cancel the Agreement between them dated as of December 10, 1953, and that Holeproof [petitioner] release and surrender its exclusive license and rights to use said Coile Machines and to said inventions and patents, and Holeproof [petitioner] has agreed to do so but only upon the terms and conditions and for the consideration hereinafter set forth.

* * * * * * *

* * * In consideration of the premises of this Agreement, the surrender by Holeproof [petitioner] of its rights under said Agreement of December 10, 1953, as exclusive licensee of said Coile Machine and the inventions and patents relating thereto, and the surrender and release by Holeproof [petitioner] of all of its claims for damages against Coile for failure to deliver and for default otherwise in the provisions of said Agreement, Coile does hereby covenant and agree:

(a) To pay to Holeproof [petitioner] immediately when this Agreement becomes effective as stated in Paragraph 2 hereof, the sum of Ten Thousand Dollars ($10,000) in cash.

(b) To complete the manufacture of and to deliver to Holeproof, [petitioner] without any further charge whatsoever, forty (40) additional Coile Machines having the same needle count and cylinder diameter, and cammed and jacked up for the same pattern (a four-diamond sock) as are now on machine, Serial No. 102, with all reasonable speed and diligence, and to complete delivery of all of said forty (40) Coile Machines in no event later than May 1, 1955, it being expressly understood and agreed that time is of the essence of this Agreement.

The agreement provided for liquidated damages in the event delivery of the 40 machines was not completed by May 1, 1955. This agreement also provided that petitioner was to continue to have the right to the unrestricted use, operation, and enjoyment of all Coile machines purchased by it without further royalties or fees.

On January 21, 1955, petitioner and Textile Machine Works executed an agreement under which Textile unconditionally guaranteed

performance by Coile of the 1954 agreement between Coile and petitioner and agreed to give petitioner a nonexclusive option to purchase any additional Coile machines with provision as to certain preference in delivery to be given to petitioner over other customers. Textile also agreed that petitioner should have the nonexclusive right, without payment of royalties or fee, to the use, operation, and enjoyment of all machines purchased by it. Pursuant to the agreement of December 31, 1954, petitioner received from Coile, during 1955, 40 Coile machines at a value of $3,000 per machine.

In its 1955 Federal income tax return, petitioner reported $120,000, the value of the 40 Coile machines, as long-term capital gain. Respondent in his notice of deficiency determined that this $120,000 represented ordinary income.

Some of the facts have been stipulated and are found accordingly.

#### OPINION.

The first issue in this case is whether the distribution of $1,500,000 to petitioner by its subsidiary, Fowler of Canada, on December 27, 1955, constitutes an ordinary dividend or a distribution in partial liquidation [1] within the meaning of section 346(a) of the Internal Revenue Code of 1954.[2]

Petitioner first contends that section 346 of the 1954 Code set up new criteria for determining when a distribution is in partial liquidation and that under the provisions of this section it is necessary that there be adopted by formal resolution of the shareholders a plan of complete liquidation or of partial liquidation. The petitioner, in its argument, contends that the adoption of such a plan requires, if the plan is one of complete liquidation, a formal action stating that such action constitutes a plan of complete liquidation, or, if the plan is one in redemption of a part of the stock of the corporation, that a formal plan, so entitled, adopted by the shareholders, is a prerequisite for a distribution to qualify under section 346(a)(2). Petitioner argues that not only is such a plan a prerequisite, but that the distribution must be made pursuant to such plan which, of necessity, means that the plan must be adopted prior to the date of the distribution. Thus,

---

[1] Petitioner and respondent agree that if this distribution is an ordinary dividend, petitioner is entitled to the foreign tax credit deemed to have been paid as provided in sec. 902, I.R.C. 1954.

[2] SEC. 346. PARTIAL LIQUIDATION DEFINED.

(a) IN GENERAL.—For purposes of this subchapter, a distribution shall be treated as in partial liquidation of a corporation if—

(1) the distribution is one of a series of distributions in redemption of all of the stock of the corporation pursuant to a plan ; or

(2) the distribution is not essentially equivalent to a dividend, is in redemption of a part of the stock of the corporation pursuant to a plan, and occurs within the taxable year in which the plan is adopted or within the succeeding taxable year, including (but not limited to) a distribution which meets the requirements of subsection (b).

petitioner argues that the numerous cases decided with respect to whether a distribution was an ordinary dividend or a distribution in partial liquidation under the 1939 Code have little if any bearing on the question when presented in a case governed by the 1954 Code. Certainly, the language of the 1954 Code is clear that the distribution, to qualify under section 346(a)(1) or (2), must be made pursuant to a plan. However, there is no statement in the Code or regulations [3] that the plan must be one which is so denominated in a formal resolution of the shareholders. In the light of the legislative history of this section we hold it to be sufficient if there has been adopted by action of the corporation, formal or informal, a plan which as a matter of fact shows itself to constitute a plan of complete liquidation or redemption of a part of the stock of the corporation if the other criteria of section 346(a)(2) are met.[4]

---

[3] Sec. 1.346–1 [Income Tax Regs.] PARTIAL LIQUIDATION.—(a) General.—This section defines a partial liquidation. If amounts are distributed in partial liquidation such amounts are treated under section 331(a)(2) as received in part or full payment in exchange for the stock. A distribution is treated as in partial liquidation of a corporation if—

(1) The distribution is one of a series of distributions in redemption of all the stock of the corporation pursuant to a plan of complete liquidation, or

(2) The distribution—

(i) Is not essentially equivalent to a dividend,

(ii) Is in redemption of a part of the stock of the corporation pursuant to a plan, and

(iii) Occurs within the taxable year in which the plan is adopted or within the succeeding taxable year.

An example of a distribution which will qualify as a partial liquidation under paragraph (2) and section 346(a) is a distribution resulting from a genuine contraction of the corporate business such as the distribution of unused insurance proceeds recovered as a result of a fire which destroyed part of the business causing a cessation of a part of its activities. On the other hand, the distribution of funds attributable to a reserve for an expansion program which has been abandoned does not qualify as a partial liquidation within the meaning of section 346(a). A distribution to which section 355 applies (or so much of section 356 as relates to section 355) is not a distribution in partial liquidation within the meaning of section 346(a).

[4] S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. (1954), pp. 49, 262.

The general language of the proposed draft would include within the definition of a partial liquidation the type of cases involving the contraction of the corporate business. Such as for example, cases which hold that if the entire floor of a factory is destroyed by fire, the insurance proceeds received may be distributed pro rata to the shareholders without the imposition of a tax at the rates applicable to the distribution of a dividend, if the corporation no longer continues its operations to the same extent maintained by the destroyed facility. Voluntary bona fide contraction of the corporate business may of course also qualify to the same extent as under existing law. In addition to the general definition of what constitutes a partial liquidation, your committee's bill provides a rule to indicate one type of distribution that will in any event, constitute a partial liquidation. Under this rule, if a corporation is engaged in two or more active businesses which has been carried on for at least 5 years, it may distribute the assets of either one of the businesses in kind, or the proceeds of their sale.

* * * * * * *

Subsection (a) is intended to provide a definition of partial liquidation which replaces that contained in section 115(i) of the 1939 Code. Primarily, this definition involves the concept of "corporate contraction" as developed under existing law. A distribution shall be treated as in partial liquidation if it is one of a series in redemption of all of the stock of a corporation pursuant to a plan or if the distribution is not essentially equivalent to a dividend and is in redemption of a part of the stock of a corporation pursuant to a plan of partial liquidation and occurs within the taxable year in which the plan is adopted or within the succeeding taxable year.

Petitioner contends in the alternative that even if the criteria applied in cases, involving the question of whether distributions were an ordinary dividend or in partial liquidation, decided under the provisions of the 1939 Code are precedents in determining cases governed by the 1954 Code, under the facts of the instant case the distribution made to petitioner by Fowler of Canada in 1955 should be considered to be an ordinary dividend.

Under the 1939 Code one of the elements which was given weight in determining the question of the nature of a corporate distribution was whether the actions of the corporation making the distribution were such as to manifest a plan to terminate or contract its business activity and that the corporation proceeded to carry out such plan or program. *Flanagan* v. *Helvering*, 116 F. 2d 937 (C.A.D.C. 1927), affirming a Memorandum Opinion of this Court.

Under section 346(a) of the 1954 Code, action which showed such a plan would be a necessity for the distribution to constitute a distribution in partial liquidation. It was recognized early that "liquidation is not a technical status which can be assumed or discarded at will by a corporation by the adoption of a resolution by its stockholders, but an existing condition brought about by affirmative action, the normal and necessary result of which is the winding up of the corporate business." *W. E. Guild*, 19 B.T.A. 1186, 1204 (1930). While the issue is factual, criteria have been established as to the elements which have an important bearing upon the question. These elements include, "the presence or absence of a real business purpose, the motives of the corporation at the time of the distribution, the size of the corporate surplus, the past dividend policy, and the presence of special circumstances relating to the distribution." *Joseph W. Imler*, 11 T.C. 836, 840 (1948).

Respondent argues that in the light of these criteria, petitioner's adoption in 1955 of the contract providing for the sale of its assets to Fowler of Canada and the related agreement that it would not engage in business activity of a nature similar to that in which it was previously engaged and would encourage its employees to become employees of the purchasing corporation and turn over to that corporation all information with respect to its operation, was, in effect, the adoption of a plan of liquidation.

Petitioner does not contend that the contract adopted by the board of directors and stockholders of Fowler of Canada was not a disposition of the operating assets and present business of the corporation but does contend there is a distinction between the disposition or liquidation of the assets and business and the liquidation of the corporation. In this connection petitioner cites and relies upon such cases as *Herbert A. Nieman & Co.*, 33 T.C. 451 (1959); *Ernest F. Becker*, 22 T.C.

932 (1954), affd. 221 F. 2d 252 (C.A. 2, 1955); *Charles D. Chandler*, 22 T.C. 1158 (1954), affd. 228 F. 2d 909 (C.A. 6, 1955); and *Schuman Carriage Co., Ltd.*, 43 B.T.A. 880 (1941), in all of which, under the facts of the particular case therein analyzed, distributions resulting from some contraction of corporate activities were held not to be necessarily a distribution in partial liquidation as distinguished from an ordinary dividend.

Respondent cites and relies upon such cases as *J. Paul McDaniel*, 25 T.C. 276 (1955); *Aurore B. Benoit*, 25 T.C. 656 (1955), vacated and remanded for modification 238 F. 2d 485 (C.A. 1, 1956); *Robert Gage Coal Co.*, 2 T.C. 488 (1943); *Edward S. Bacharach*, 29 B.T.A. 282 (1933); *William H. Monk, Jr.*, 29 B.T.A. 556 (1933); *James P. Gossett*, 22 B.T.A. 1279 (1931), affd. 59 F. 2d 365 (C.A. 4, 1931); and *Joseph W. Imler, supra*. It would serve no useful purpose to analyze in detail the various cases cited by the parties since all of them involve factual situations that differ in some respects from the present facts. Bearing in mind the criteria set forth in the decided cases and analyzing all of the facts of record in the instant case, we have concluded that the distribution by Fowler of Canada to petitioner in 1955 constituted a distribution in partial liquidation. The record is clear that Fowler of Canada received $1,842,044.45 in cash for the assets it sold to Kayser of Canada, which were all its assets other than cash, accounts receivable, and the fixed assets which were leased to Kayser of Canada. Thereafter, it was engaged in no business other than the collection of rents from its fixed assets from Kayser of Canada under a lease agreement, which provided for the sale of those assets to Kayser of Canada at the expiration of the 5-year lease. It is clear that there was a contraction of operation of Fowler of Canada and its capital requirements, which constituted a legitimate business purpose for reducing its outstanding capital stock. As a result of the sale of its assets, Fowler of Canada had excess funds which were not required for its business operations. There is no evidence as to the cash surplus of Fowler of Canada prior to the sale of its assets but the evidence is clear that the cash of over $1,800,000 which it received as a result of the sale of its assets was not necessary in its very restricted operation of collecting rents from Kayser of Canada.

There is no evidence in the record of the prior dividend policy of Fowler of Canada. While there is no direct evidence of the motives of Fowler of Canada in making the distribution, its business situation after the sale of its operating assets was such as to give a clear inference that it was motivated by the fact that the cash resulting from the sale of these assets was not needed in its very restricted business. It is, of course, a fact that no stock was actually redeemed by Fowler

of Canada. However, since there was only one stockholder, petitioner, it was immaterial how many shares of stock represented that interest. The interest was the same whether or not any part of the stock was retired. Cf. *Aurore B. Benoit, supra* at 665, and *J. Paul McDaniel, supra.*

As set forth in our findings, in a number of documents filed by Fowler of Canada, it indicated that it was in the process of liquidation and dissolution; and on its Securities Transfer Tax Act return, filed with the Province of Ontario, referred to the nature of its business as "in process of liquidation."

Petitioner, in its request for ruling to the Internal Revenue Service made on December 9, 1955, only shortly before the distribution of December 27, 1955, stated that "On July 1, 1960 such leased assets will be sold and both Holeproof [petitioner] and its Canadian subsidiary will then complete their program of dissolution." The officer of Fowler of Canada who signed the various returns which referred to Fowler of Canada as in the process of liquidation and dissolution was not called as a witness and his absence was not explained in the record. These statements were said by a partner in the accounting firm which conducted an annual independent audit to be in error. It is difficult to understand why documents filed by Fowler of Canada at dates only slightly preceding or subsequent to the time petitioner's corporate tax return indicating the $1,500,000 distribution as an ordinary dividend was filed, would refer to Fowler of Canada as being in the process of liquidation and dissolution, if they were untrue.

We have considered the fact that Fowler of Canada had not at the time of the trial of this case been dissolved and that in 1960 its stock had been distributed to the stockholders of petitioner. We also have noted that at the date of this trial Fowler of Canada had engaged in no business whatsoever since the final sale of its assets to Kayser of Canada on July 14, 1960, and its stockholders had made no determination as to the action to be taken with respect to the disposition of Fowler of Canada's assets consisting entirely of cash and Government bonds. It may be that the stockholders will ultimately use Fowler of Canada for the transaction of some business, but in our view, after weighing all the evidence, this would result in a change from the plan at the time the stockholders of Fowler of Canada approved the sale of all of its assets to Kayser of Canada on September 6, 1955, and at the time of the declaration of the dividend to petitioner on December 20, 1955. We hold the $1,500,000 paid to petitioner on December 27, 1955, by Fowler of Canada to be a distribution in partial liquidation.

Petitioner argues, in the alternative, that if the $1,500,000 distribution to it by Fowler of Canada was a distribution in partial liquidation, nevertheless this distribution constituted a dividend under

section 902(a) of the Internal Revenue Code of 1954,[5] and it is, therefore, entitled to the same credit for taxes deemed to have been paid as if the distribution had been an ordinary dividend. Respondent disagrees with petitioner's contention.

The only case cited by either party directly on this point is *Freeport Sulphur Co.* v. *United States*, 163 F. Supp. 648 (Ct. Cl., 1958), Addendum 172 F. Supp. 462 (Ct. Cl., 1959), which holds contrary to the petitioner's view. Petitioner points to the factual difference between the *Freeport Sulphur Co.* case and the instant case, particularly to the fact that in the *Freeport Sulphur* case the taxpayer had a lesser income tax payable by treating the distribution as one in partial liquidation without any credit for taxes deemed to have been paid, than it did by treating the distribution as an ordinary dividend and taking a credit for taxes deemed to have been paid. While the Court of Claims, in its decision, did refer to this fact, in our opinion the result reached is correct even in such a case as the instant case where the tax payable by treating the payment as an ordinary dividend and allowing the credit for foreign taxes deemed to have been paid is less than the tax payable by treating the payment as a distribution in partial liquidation without allowance of the credit for foreign taxes deemed to have been paid. Section 331(a)(2) of the 1954 Code provides that amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. This carries as a natural corollary that such amounts shall not be treated as dividends. A distribution in partial liquidation is not the receipt of a dividend from a foreign corporation, but is a receipt in partial or full payment for stock. This holding is also consistent with the holding of this Court in *Robert Gage Coal Co.*, *supra*, that the provisions referred to in section 26 of the 1939 Code allowing dividend paid credit to a corporation for 85 percent of the dividends received from a domestic corporation plainly refers to ordinary dividends and not liquidating dividends.

The last issue in this case is whether the amount of $120,000 representing the value of 40 Coile machines received by petitioner in 1955, is long-term capital gain or ordinary income. Petitioner argues that the amount of $10,000 paid to it in cash by Coile was paid as damages for breach of the 1953 contract to deliver 60 Coile machines in 1954 and that the 40 Coile machines of a value of $120,000

---

[5] Sec. 902(a) TREATMENT OF TAXES PAID BY FOREIGN CORPORATIONS.—For purposes of this subpart, a domestic corporation which owns at least 10 percent of the voting stock of a foreign corporation from which it receives dividends in any taxable year shall be deemed to have paid the same proportion of any income, war profits, or excess profits taxes paid or deemed to be paid by such foreign corporation to any foreign country or to any possession of the United States, on or with respect to the accumulated profits of such foreign corporation from which such dividends were paid, which the amount of such dividends bears to the amount of such accumulated profits.

represented a payment to petitioner for the release of the exclusive license petitioner held for the use and operation of Coile machines. Petitioner contends that the exclusive license constituted property held for more than 6 months and the contract entered into between petitioner and Coile in December of 1954 constituted a sale or exchange of a capital asset within section 1222 of the Internal Revenue Code of 1954. Respondent contends that petitioner has failed to establish what portion, if any, of the $120,000 representing the value of 40 Coile machines was in payment for the release of the petitioner's exclusive license for the use and operation of such machines and in the alternative argues that in any event such payment would not be taxable as a gain from the sale or exchange of a capital asset. Petitioner contends that it was unaware that respondent questioned the fact that the $120,000 representing the value of the 40 Coile machines was not in its entirety in payment for the release of the exclusive license for the use of these machines.

We have set forth in some detail in our findings the provisions of the contract of December 31, 1954. The contract does not specify the portion of the payments thereunder that constituted payments for damages for failure to deliver the machines as distinguished from the portion which constituted payment for surrender by petitioner of its exclusive license. This contention as to burden of proof arises in connection with an issue as to which all facts of record were stipulated. Petitioner alleged in its petition the distribution of the payment of the $10,000 cash and the $120,000 value of the 40 Coile machines to be such that the $10,000 represented damages for failure to deliver the machines and the $120,000 represented payment for the release by petitioner of its exclusive license to the use of the Coile machines. This allegation was denied by respondent in his answer.[6] The burden rests upon petitioner to prove this allegation as to the allocation of the payments. There is no evidence of record of any type upon which a reasonable division of the payments might be made. Cf. *Raytheon Production Corporation*, 1 T.C. 952, affirmed on another issue 144 F. 2d 110, certiorari denied 323 U.S. 779 (1944). The contract does recite that petitioner has been substantially damaged in an amount which is not ascertainable and does set forth both the payment of the $10,000 and the delivery of the 40 Coile machines of a value of $120,000, to be in payment for the release by petitioner of its rights under the December 10, 1953, contract and for damages for the failure on Coile's part to deliver the machines under the December 10, 1953, contract. No recitation is made as to the value,

[6] Respondent's notice of deficiency merely stated "It is held that the $120,000 which you reported as long-term capital gain and as being received for the exclusive license rights to use, and to inventions and patents of Coile machines, is taxable as ordinary income under the provisions of section 61 of the Internal Revenue Code of 1954."

224

if any, of this exclusive license to the petitioner. Under the terms of the 1953 contract petitioner was required to pay an additional amount which could be as great as $60,000 within 9 months after delivery of the first 60 Coile machines and $35,000 a year for 9 years thereafter to keep its exclusive license. Under these circumstances we hold that petitioner has failed to show what portion, if any, of the $120,000 value of the Coile machines to be delivered to it was in payment for anything other than damages.

The taxability of a payment for damages sustained is governed by the nature of the claim which is settled. Cf. *Estate of J. T. Longino*, 32 T.C. 904 (1959). In the instant case, the basis of petitioner's claim for damages from Coile is not established but it is reasonable to assume from the evidence of record that the petitioner was damaged as a result of not having available 42 Coile machines for use in the production of articles to be sold in the regular course of business. Payment in settlement of a claim for damages of this kind is taxable as ordinary income. We sustain respondent on this issue.

In view of our holding that petitioner has failed to establish what portion, if any, of the $120,000 representing the value of 40 Coile machines, was in payment for release of its exclusive license, we deem it unnecessary to comment upon whether the transfer of the exclusive license under the 1953 contract constitutes a sale or exchange.

Because of issues raised in the petition which have been disposed of by agreement between the parties,

*Decision will be entered under Rule 50.*